**RICHARD P. POINTER, ESQ., SBN: 86630**
HINKLE, JACHIMOWICZ, POINTER & EMANUEL
2007 W. Hedding Street, Suite 100
San Jose, Ca 95128
Telephone:  (408) 246-5500
Facsimile:  (408) 246-1051

Attorneys for Defendant
**MARK ALFRED FIRST**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO: CR-07-00622(JF) |
| Plaintiff, | **ATTACHMENT TO SENTENCING MEMORANDUM** |
| vs. | |
| MARK ALFRED FIRST | |
| Defendant. | |

## ATTACHMENT TO SENTENCING MEMORANDUM

Dr. Abbott's Report dated June 10, 2008

Brian R. Abbott, Ph.D.
Licensed Clinical Psychologist
PSY 18655

# Forensic Psychological Services

1250 Oakmead Pkwy, Ste 210
Sunnyvale, CA 94085-4037

(408) 451-8465  Tel
(408) 267-2660  Fax
dr.abbott@comcast.net

June 10, 2008

Mr. Richard Pointer
Attorney at Law
H J P & E
2007 W. Hedding Street, Suite 100
San Jose, CA 95128

Dear Mr. Pointer:

The following is the report of findings from my psychological evaluation of Mark First. Should you have any questions, please feel free to contact me.

## REASON FOR REFERRAL

Mark First is a forty-five-year-old man whom the U.S. Attorney charged with one count of possession of materials containing any visual depiction of a minor engaging in sexually explicit conduct. Mr. First is currently in custody awaiting sentencing on the matter. Before the Defendant was taken into custody, his legal counsel referred him to this examiner for a psychological evaluation to address the following questions:

1. Is the Defendant considered a pedophile?
2. If not, what contributed to his apparently aberrant behavior?
3. What is his risk to engage in future sexually offending behavior?

## INFORMED CONSENT

Before conducting the evaluation, the examiner informed the Defendant of the purposes and probable uses of the evaluation as well as the limitations of confidentiality. He agreed to participate in the evaluation under these conditions.

## CONTACTS AND MATERIAL REVIEWED

The examiner saw the Defendant three times for a total of eight hours and five minutes. The examiner evaluated Mr. First by administering the Millon Clinical Multiaxial Inventory-III ("MCMI-III"), the Abel Assessment for Sexual Interest- Second Edition™ ("AASI-2"), and by conducting a semi-structured clinical interview. The examiner used the NCS Microtest computerized system to score and interpret the MCMI-III. The test developer scored the Abel Assessment for Sexual Interest™ and the examiner interpreted the findings.

Before conducting the examination, the evaluator reviewed and considered the Department of Homeland Security ICE Report of Investigation Bates stamped pages 1-56, medical records from Mr. First's psychiatric admission to Community Hospital of the Monterey Peninsula in April 1980, eleven handwritten pages produced by Mr. First entitled timeline, and the Federal Probation Officer's Presentencing Investigation Report in arriving at the opinions and conclusions stated herein.

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 2*

## SUMMARY OF RELEVANT BACKGROUND INFORMATION

**1. Upbringing and Current Family Relationships:** Mr. First is the youngest of four children born to his biological parents. He has two brothers who are two and five years older than him. His sister Lisa is four years his senior. Mr. First was five years old when his parents divorced. He stated that his mother remarried to a man by the name of Dan First within one year after the parental divorce. His mother had Dan First adopt all of the children and gave them his last name (the Defendant's birth name was Mattos). His father remarried to a woman by the name of Dorothy within the first year after the divorce.

The Defendant stated that he lived a "storybook" life prior to his parents divorcing. When the examiner questioned him about the reasons for his parents' divorce, he said that his mother told him she left his father because he brutally beat and abused her, which his mother confirmed to the U.S. Probation Officer. Mr. First related that he never observed his father acting in physically or sexually abusive ways toward his mother. He described his parents went through an acrimonious divorce and custody dispute. He characterized that his family was torn apart by the divorce. Mr. First said that he and his sister went to live with his mother after the divorce while his two brothers lived with their father. He reported feeling quite distressed over this circumstance because he wanted to live with his father.

Despite his desire to live with his father, Mr. First reported troubling conditions when he visited or lived with his father (apparently his mother sent him to live with his father from time to time). He described his father as having a bad temper. He stated that his father acted in hostile ways, kicked down doors, and generally discharged his anger impulsively including, acting in physically aggressive ways toward the children. After describing these problems, Mr. First stated that the relationship with his father was "generally good."

Mr. First recalled having a tension-filled relationship with his mother whom he described as irritable and yelling at him often. He recalled times where she threatened to hit him with a broom but Mr. First stated his mother never acted in physically abusive ways toward him. He reported times when he got along well with his mother.

Mr. First described his stepfather as the "mean and sadistic type." He reported that Dan acted in physically abusive ways toward him as well as speaking to him in derogatory ways. He perceived that Dan "tortured me" but he never reported Dan acting in ways that would be considered torturous. According to the U.S. Probation Officer's report, the Defendant's mother confirmed the abusiveness exhibited by Dan (she divorced him when Mr. First was an adolescent).

The psychiatric records indicated that his 1980 admission for a psychotic disorder was around the time that his mother and stepfather were divorcing. He complained that his stepfather showed little love toward him and favored his natural son over Mr. First. Moreover, he described his mother as "messing around with other men while still married to my stepfather."

**2. Health and Psychiatric History:** The Defendant reported an unremarkable health

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 3*

history until the age of eighteen when he was involved in a motor vehicle accident. Mr. First related that a drunken driver hit his car and he sustained a neck injury. He never suffered from loss of consciousness or a head injury. Mr. First stated that this injury has caused him immense back and neck pain since then. He reported feeling pain and numbness radiating down his left arm and he has suffered from a pinched nerve in his spine. He also complained of blurry vision from time to time. In discussing this situation, Mr. First characterized he was "sold out" by the attorney representing him in the civil action against the drunken driver. He elaborated by referring to this individual as "bastard attorney."

Other than the injuries he sustained in the motor vehicle accident, Mr. First related he has suffered from no serious medical conditions, head injuries, or seizures. He described experiencing days when "I ache all over" for no apparent reason, which he reported starting approximately August or September 2007. He also worries about contracting cancer because "I smoked hard-core for twenty years."

Mr. First reported frequent episodes of major depression with onset approximately ten years ago. He said the duration of these episodes have lasted two weeks or longer. He characterized himself feeling good and suddenly being struck with depression and gloom, "like a cloud over my head." As he described this situation he burst out crying. His symptoms of depression have included sadness, negative thinking about himself, others, and his future, suicidal thoughts, insomnia, diminished attention and concentration, diminished energy for normal activities, fatigue, and low self-esteem. He stated that his suicidal thoughts consisted of ideas of driving a vehicle off a cliff but he has never acted this way because "I don't want to hurt my family."

The Defendant reported experiencing no symptoms consistent with mania.

The Defendant described feeling significantly anxious over the current matter. He related that he has felt tense, irritable, and overwhelmed. In characterizing the effect of the anxiety on him, he said, "bogs down my brain so much because my mind stops" (sic). He reported his hand trembles at time from feeling anxious.

Mr. First reported an onset of psychotic symptoms during his adolescence. He related experiencing auditory hallucinations consisting of people talking about him. He described his thinking becoming disorganized, which severely impairs his functioning as he has difficulty focusing (i.e., diminished attention and concentration) and formulating thoughts in which to guide his behavior. During such episodes, he described himself as "ricocheting around," where nothing makes sense and he feels as if he is in a "haze." He described never experiencing command hallucinations. He reported that his disorganized thinking has resulted when he has felt depressed.

Mr. First stated that he has taken various psychiatric medications during his adolescence. He said that he has taken Stelazine, Cogentin, and Haldol, as well as other medications but he could not recall the brand names. The medications that he recalled taking are of a class used to treat psychotic disorders. In discussing his use of psychotropic medications, Mr. First commented, "I hate medicines." He said he last took psychotropic

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 4*

medications at the age of eighteen.

The Defendant recalled being admitted to psychiatric hospitals three times during his late adolescence. He recalled the first admission being involuntary under the California Welfare and Institutions Code §5150. As he recounted this involuntary admission to the psychiatric hospital, Mr. First went on at length about how the doctors in the hospital "didn't give a shit about me." He then digressed into a similar rant about how his attorney does not care about him and he expressed concern over the fact his attorney failed to return telephone calls he made to him and believed his attorney was not working on his case. When the examiner questioned him about the basis from which he made these accusations against his attorney, the only information from which he appeared to form this opinion about his attorney was the claim that his attorney would not return his telephone calls.

Mr. First remembered a second psychiatric admission where he stayed hospitalized for almost one year. He recalled undergoing treatment during this time. He recalled little information about this admission. Later during the evaluation, Mr. First stated that he was actually admitted to a psychiatric hospital for a time and then he was sent to live in various group homes for mentally ill adolescents. The total time in the hospital and group homes was approximately one year. He recalled taking psychotropic medications during this time, although he could not recollect the exact names.

On April 24, 1988, Mr. First was admitted to the Community Hospital of the Monterey Peninsula, when he was seventeen years old. His family originally brought him to a hospital in Salinas because he was acting in bizarre and unusual ways. Apparently, the Defendant was isolating himself from family and other social contacts. He lost his temper easily, was performing poorly in school, and, the weekend before his admission, the father described his son engaging in autistic behavior by repeatedly picking up and dropping a chair while seemingly fascinated by this behavior. At the time, Mr. First talked about getting into his father's gun cabinet and possibly killing someone or something. The father described him as acting suspicious of others. He also quoted from the Bible and from the dictionary. He exhibited loosening of associations and his affect was very labile. He was diagnosed with an acute schizophrenic episode. During his two-week hospital stay, he was placed on antipsychotic medication. The treating psychiatrists observed that his thinking became more logical and orderly, he was better in contact with reality, and, as a result, the doctor discharged him. There were no indications in the medical records indicating Mr. First acted in physically aggressive or sexually inappropriate ways. The records never mentioned him having any disordered thinking related to sexual content including, prepubescent children.

Other than his psychiatric hospitalizations as an adolescent, Mr. First said he has not undergone mental health treatment, either outpatient or inpatient, during his adult years.

Mr. First's family history is positive for mental illness. He reported that his brother Jeff was diagnosed with Bipolar Disorder with psychotic features. He said that his brother continues to suffer from this disorder until this day. He stated that various members on the paternal side of the family off also suffer from mental illness, although he could not explain the nature of these disorders.

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 5*

**3. School and Employment:** When the examiner began to question Mr. First about his schooling, he launched into a diatribe about various family problems that he experienced during this time of his life. After the examiner refocused Mr. First on the topic of his schooling, he stated that he completed the tenth grade but dropped out of school in the eleventh grade. He attributed his failure to complete school to his disgust over the school system. He described how school authorities "let me down." When the examiner questioned him as to the basis of this complaint, he stated that he felt behind academically and perceived it was the school's fault for not helping him. As he discussed this area, Mr. First burst out crying almost into a hysterical state.

The examiner questioned Mr. First about his overall academic performance. He responded by stating that he wanted to get good grades and then launched into another diatribe about how his parents and school authorities lied to him by not rewarding him for good grades and, consequently, he performed poorly in reaction to his disappointment. The Defendant stated he had difficulty with mathematics. He recalled that he never participated in special education.

Apparently, Mr. First got along with school authorities adequately. He described having a few trivial conflicts with teachers. He characterized himself as respecting and caring for his teachers.

The Defendant reported times when he had difficulty concentrating or paying attention to his schoolwork because he was day dreaming or his mind wandered. Medical records from his 1980's psychiatric hospitalization also reported him having difficulty paying attention in class because of day dreaming. He did not appear to suffer from persistent inattention associated with Attention Deficit Hyperactivity Disorder. Mr. First related that he never exhibited symptoms of hyperactivity nor did the medical records indicate this.

Mr. First stated he had a vague recollection of being suspended once during elementary school for talking back to a school authority. He reported no other times when he was suspended. He stated that school authorities never expelled him.

The Defendant stated that he enrolled in Sequoia Automotive School because he wanted to learn to be a mechanic. Within two weeks after his enrollment, he was injured in a motor vehicle accident, described previously in this report, and his injuries prevented him from continuing in the school. He said this experience caused him to "go into a slump." He launched into another diatribe criticizing his attorney at the time whom he described as "screwing me" by settling case for what Mr. First considered a low dollar amount.

When he was still enrolled in high school, Mr. First said he began working around the house performing chores for allowance. He later worked at a pizza parlor.

After sustaining injuries in the motor vehicle accident that resulted in serious and persistent physical pain, Mr. First said he was unable to work for approximately ten years. Subsequently, he slowly resumed employment through temporary positions and then "I got

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 6*

interested in construction." He reported learning a variety of types of construction-related skills. He worked for approximately four and one-half years for the same company hanging doors. He was laid off from this position in October 2007. The Defendant related that he performed piece work for another construction company for several weeks but they had not referred any work to him for months.

When the examiner questioned him about being fired from positions of employment, Mr. First stated that he may have been fired but could not recall. He described having significant interpersonal conflicts with superiors because he perceived they were taking advantage of him. He said that he felt angry, upset, and resentful because of this and he sometimes "growled back" or ignored how he felt. Mr. First stated that he got along well with coworkers for the most part. He reported isolated instances of expressing irritation toward coworkers in reaction to his perception that they were "treating me mean."

**4. Law Violations:** Mr. First stated that he was never in trouble with the law as an adolescent. He reported becoming a "ward of the state" due to his multiple psychiatric hospitalizations. The examiner had no information to confirm this assertion. It was clear from the 1980 hospitalization that his mother admitted him. There were no indications he was under conservatorship at this time. It may have been possible that he was under conservatorship during the year he spent in a psychiatric hospital and various group homes for mentally ill youngsters.

The Defendant said he was once stopped by the police for suspected drunk driving but was released. He claimed he was not under the influence of substances. The U.S. Probation Officer's report indicated he was released because his blood alcohol level was below the legal limit. He reported never being in trouble with the law before his actions in the current matter.

The U.S Probation Officer report indicated the Defendant has not been arrested for any other crimes except the suspected DUI and the current matter. This report also indicated no known juvenile arrest history.

**5. Substance Use:** Mr. First said that he tried LSD during his adolescence. He never used this drug regularly. He also smoked marijuana on rare occasions during his adolescence only. When the examiner questioned Mr. First about his consumption of alcohol, he responded, "I never got into it." Currently, he said he consumes no more than six beers per month. He never reported a time in his life where he consumed alcohol excessively or to an extent where he would qualify for a diagnosis of alcohol abuse or dependence.

Mr. First has a sister, Lisa, who he described as "a hard-core alcoholic." He said that her substance use disorder is so severe that it has prevented her from finding employment over the past years. He believes her substance use problems related to the fact that she was sexually abused by her stepfather when she was younger. His mother confirmed that her daughter was sexually abused.

**6. Peer Relationships:** Mr. First stated that he had difficulty making friends throughout much of his life. During his school years, he complained of not having the social skills or self

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 7*

worth from which to develop and sustain peer friendships. He recalled being harassed by his peers up until the age of thirteen or fourteen because of a large mole on his face. After having the mole removed around the age of thirteen or fourteen, the harassment by peers stopped; however, the emotional trauma of this situation lingered.

Mr. First said he did not have any relationships with female peers during his adolescence. He said that he always found peer age females "beautiful" but "I was never brave to ask one out." He described himself as feeling terrified of female peers. During his later adolescent years, he found himself feeling more comfortable with "stoner girls" because he felt like he fit in with outcasts.

The Defendant stated that he began dating after the age of eighteen. He found dating a difficult proposition because he lacked the social skills that one normally develops during adolescence to master this maturational task. As he described this time of his life, Mr. First cried. He stated that he has "settled for less" in terms of personality and physical qualities in females because he perceives himself as unable to establish relationships with attractive females. He reported having approximately four girlfriends.

The Defendant stated that he has had two live-in relationships with women, with one lasting almost five years. His relationships with live-in and other girlfriends have been marked by significant conflicts and problems. In one live-in relationship, he reported speaking to his girlfriend in derogatory and mean ways. He said he has never acted in physically abusive ways with his girlfriend or other females. He also reported his live-in girlfriends having affairs with other men. Apparently, he tolerated this behavior.

After ending one of his live-in relationships, Mr. First reported feeling quite depressed over the breakup. He described that he cried every day for one week. The Defendant said he went to church to pray about the situation and to ask God to take away his pain. He claimed that he heard God's voice speaking to him "clear as a bell." He reported hearing God tell him "Eat what I give you. Marry a virgin." The examiner notes that Mr. First cried quite hysterically while he recounted this situation to the examiner.

**7. Psychosexual Development:** The Defendant reported the onset of sexual feelings around the age of fourteen or fifteen. He could not recall how he learned about sex when questioned by the examiner. Mr. First said he had no one to talk with about sexual matters and acknowledged feeling awkward and uncomfortable regarding his developing sexual feelings. He reported the onset of sexual activity at the age of eighteen. He described his sexual orientation as a heterosexual adult.

Mr. First stated that he has engaged in sexual relations with ten or more females. Mr. First said all of his sexual partners have been near his age. He said that he feels physically attracted to a woman's face and her secondary sexual characteristics such as breasts and hips. Mr. First related that he has never experienced sexual thoughts or feelings toward prepubescent females.

When questioned about a history of sexual victimization, Mr. First gave an equivocal

response. He recalled two instances where his stepfather took him into a private sauna room and required him to remove his clothing to sit in the sauna. His stepfather also removed his clothing and sat nude in the sauna at the same time Mr. First was there. He recalled feeling uncomfortable with this situation but does not recall his stepfather acting in sexual ways toward him. This information is consistent with what he told the U.S. Probation Officer

Mr. First said that he has found himself looking at attractive adolescent females who exhibit secondary sexual characteristics like a woman. He said that he has only admired their physical beauty and has had no urge to touch them sexually. He described being attracted by what he termed their "purity." He described purity as meaning females who have been "unspoiled by negative experiences in life." Consequently, he believes that females of this age would treat him well. He elaborated by stating that these thoughts help to compensate for his negative experiences during his adolescence. In essence, such fantasies provide the means to relive his adolescence in fantasy and to experience positive relationships with females. Contrary to his earlier assertion, Mr. First stated he has become sexually aroused by these fantasies and he has sometimes masturbated to them. Concurrent to these fantasies, Mr. First said that he has felt disappointed because he has lamented over the possibility of having a "pretty girlfriend during his adolescence. He steadfastly maintained that he has never crossed the line of actually engaging in sexual activity with a pubescent, underage female.

**8. Information Regarding the Current Offenses:** Mr. First said that he initially observed pornography involving underage females approximately six years ago when surfing the Internet for adult pornography. He reported happening upon pornography involving pubescent, underage females when following links in adult pornography websites. He said that he sometimes happened upon child pornography, involving prepubescent children, occasionally but he immediately left these web pages because he was not interested.

The Defendant said that he subscribed to pornographic websites involving adults. He said that he suspended his subscriptions to this material because it depicted "too much of nasty sex acts that grossed me out." He said that he also subscribed to pornographic websites depicting teenage females. Based on discussions with Mr. First, it was difficult for the examiner to determine whether these websites involved actual pubescent underage females versus adult females who role-played underage pubescent females.

Mr. First stated that the frequency of him viewing pornography increased to almost daily when he felt depressed. He only accessed pornography from Internet websites. He never obtained pornographic material via e-mail or over Internet Relay Chat ("IRC"). Mr. First said that he had automatic downloading software on his computer but he never used it to access pornography.

The Defendant stated that he downloaded single images and single videos onto his computer. He reported never sorting or classifying the adult or child pornography that he downloaded. He reported meeting an individual in an online community referred to as "Sp Forum" and they communicated online. He stated that he asked this individual about sites that might have contained pornography of adolescent females. He said the individual gave him the names of some sites as well as sending him two to three pornographic pictures of nude

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 9*

adolescent females. Mr. First said the last time he downloaded images of pornography involving underage females was approximately one month before his computer was seized by the authorities.

Mr. First told the investigating federal agent that he had approximately 1,000 images of pornography on his computer. The U.S. Probation Officer's report indicated there were 340 images and 80 videos containing child pornography. He related that his statement to the authorities was a guess and he really had no idea how much child pornography he had on the computer. Mr. First believes that the predominance of the child pornography on his computer consisted of images of adolescent females who were naked. While this was not confirmed in the analysis of the images, since not every image was rated by the physician assistant, the U.S. Probation Officer's report documented that only one of twenty-three images were rated as a prepubescent.

## RESULTS FROM AASI-2

The AASI-2 is a psychophysiological measure of sexual interest. The test involves two major components. First, the Defendant completed a comprehensive questionnaire that surveyed a variety of topics, including demographics, cognitive distortions, assessment of social desirability response set, and admissions to actual involvement or interest in twenty-one types of deviant sexual behavior. Second, the Defendant viewed slides where objective measures were taken beyond his awareness of sexual interest in twenty-two slide categories depicting children, adolescents, and adults, Caucasian and African American, plus depictions of various deviant sexual behaviors. For comparison, the Defendant also self-reported his ratings of sexual arousal to the same slides using a seven-point Likert scale where 1=highly sexually disgusting, 4= neither sexually disgusting or sexually arousing (neutral), and 7=highly sexually arousing.

*The Abel Assessment of Sexual Interest™ is designed to determine treatment needs and the client's risk level. Objective sexual response patterns cannot and should not be interpreted as indicators of guilt or innocence regarding any specific sexual act.*

The Defendant's objective measures taken beyond his awareness to the twenty-two slide categories showed that his significant sexual interests were adult heterosexual. This arousal pattern was reflected both in adolescent females (with secondary sexual characteristics) and adult females. The presence of clinically significant sexual interest with adolescent females is not considered a deviant finding since nonsexual offenders who take this test show similar patterns of clinically significant sexual interest in adolescent females. He showed no clinically significant sexual interest in prepubescent females or males or toward sadomasochistic sexual behavior.

Mr. First self-reported the extent to which he has engaged in twenty-one different forms of deviant sexual behavior on the AASI-2 sex-offender-specific questionnaire for men. He stated that has not engaged in all but one of the deviant sexual behavior for which he was surveyed on the questionnaire. He reported having sexual relations with two female adult strangers between the ages of thirty and forty. He related that he has never

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 10*

engaged in sexual touching of a child.

Mr. First rated the degree to which he would find himself sexually aroused to the same twenty-one deviant sexual behaviors. He rated his arousal to all but one of the sexual behaviors in the disgusting range. The Defendant reported feeling neither sexually aroused or sexually disgusted by writing obscene notes or making obscene phone calls.

Mr. First reported the extent to which he has fantasized to the twenty-one deviant sexual behaviors. He related that he never fantasizes about any of the deviant sexual behavior for which he was surveyed on the questionnaire.

The Defendant answered a series of questions that measured his level of cognitive distortions related to sexually offending behavior. These are ways of thinking that indicate if the Defendant exhibits certain forms of sexually deviant behavior as normal, as well as if he exhibits rationalizations and justifications for acting out sexually. Mr. First scored 15% on the cognitive distortions scale, which is considered a low score. This reflects that Mr. First did not endorse items on the test consistent with the way that known child molesters rationalize or justify their sexually offending behavior with children.

The AASI-2 contains a social desirability scale that helps to determine if the client's responses may have been influenced by this response bias. Mr. First scored 55% on the social desirability scale, which is considered a moderate score. This indicated that he may have presented in an overly favorable light when responding to items on the test.

The AASI-2 contains a dangerous registry that notes any responses that indicating the Defendant shows a moderate or severe concern regarding the potential for sexual reoffending. The items comprising the registry relate to the defendant's self-reported attraction to, fantasies about, and future sexual interest in young girls or boys. Mr. First did not admit to any sexual behaviors that would indicate moderate or severe concerns.

The AASI-2 contains a probability value referred to as the Past Child Sexual Abuse (CSA) Behavior model ("Past CSA Behavior"). The probability value was developed and cross validated on two groups. The first group consisted of sexual offenders who the evaluating clinician believed to have committed the sexual offense but they were denying the alleged sexual misconduct (i.e., Past CSA Behavior group). The second group was non-sexual offenders. Members of both groups took the AASI-2. Based on the results from developmental sample, consisting of both groups, a statistical model was developed from specific items on the test to predict the probability that an individual taking the test, who denied engaging in sexual abuse of a child, may fit the Past CSA Behavior group. The results from the developmental sample were cross-validated on a second sample of individuals from the two groups and the model was considered reliable. The probability value has an 81% predictive validity in correctly classifying individuals who have molested a child under the age of eighteen but who are denying the sexual offense. This means there is a 19% probability that the test will incorrectly classify someone who does not fit this group. This probability value was calculated to minimize the potential for false positive results (i.e., misclassifying those who actually did not sexually abuse a child as

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 11*

falling within the Past CSA Behavior group). Since this scale was not developed on individuals who have been referred for Internet sex crimes only, the examiner did not interpret it.

## SUMMARY FROM MCMI-III

The MCMI-III is 175-item personality test to which the subject answers true or false to various statements. The MCMI-III assesses major mental disorders, with an emphasis on personality disorders. It is considered a reliable test in developing hypothesis about an individual's personality functioning. The computerized test report uses prototypic personality characteristics based on research using patients with similar scores as the Defendant. Based on the Defendant's pattern of scores, the test report formulates personality descriptions. Like any test, the MCMI-III is not absolutely accurate in measuring personality functioning. It is possible that the Defendant's prototypic personality profile may be inaccurate by missing certain significant personality traits (false negatives) or attributing personality characteristics that he does not possess (false positives). Therefore, the results from the test must be cross validated with other information from the evaluation of the Defendant. The following provides a brief review of the major findings from the test.

The Defendant's response style to the MCMI-III suggests a broad tendency to magnify the level of his experienced illness or a characterological inclination to complain or to be self pitying. On the other end, the response style may convey feelings of extreme vulnerability that are associated with a current episode of acute turmoil. Based on his clinical presentation and the available history, this response tendency appears to result from a combination of his paranoid thinking, characterological inclination toward grumbling, and his acute emotional distress over his worry about the current matter.

The results from the MCMI-III indicate Mr. First suffers from a combination of depression and psychotic symptoms. A likely diagnosis may be Schizoaffective Disorder. His depressive condition appears to consist of irritability, agitation, and erratic qualities. Shifts are probably evident between expressions of self-deprecation and despair that are mixed with thoughts of suicide and the expressions of hopelessness and futility they may be accompanied by his bitter discontent and irrational demands. Periods of loathing for self-perceived deficits and weaknesses may be interspersed with momentary acts of defiance. Fearful that he may jeopardize his problematic situation further, Mr. First may act contrite and self-accusatory following defiant acts. Nevertheless, his typical grumbling and periodic provocations provide a vehicle for discharging tension, for reasserting self-confidence, albeit briefly, and for relieving the buildup of resentment and anger. Mr. First appears to suffer psychotic episodes characterized by fluctuating periods of disorganized and bizarre thinking. It may be possible his current endorsement of psychotic symptoms on the test may possibly reflect a phase in a more extended schizophrenic course, although the available history contradicts this.

As a result of the current matter, it appears that Mr. First feels threatened psychologically by forces he cannot manage adequately. This appears to result in symptoms of an anxiety disorder. He may experience a number of physical symptoms, as well as feeling edgy and distractible.

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 12*

      His many physical complaints are unlikely to stem from psychological factors; however, his responses suggest he may be experiencing a Somatoform Disorder. His physical difficulties from his past injury have likely become enmeshed in a psychological pattern of tension and unresolved conflicts that characterizes his life. He may exploit his physical discomfort and concerns to manipulate and control members of his family, making demands that are a weak disguise for his hostile impulses.

## REFERRAL QUESTIONS

### 1. Is the Defendant considered a pedophile?

      Based on the findings from the current evaluation, the examiner finds that Mr. First does not suffer from Pedophilia. The examiner explains how he arrived at this opinion below.

      According to the Diagnostic and Statistics Manual- IV Text Revision ("DSM-IV-TR"), Pedophilia is a disorder characterized by recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger) that occurs over a period of at least six months. The person must act upon these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty. The disorder includes various type of pedophilia including those who show a primary sexual attraction to young children (preferential child molesters), those who sexually abuse children due to a combination of psychological and situational circumstances (situational child molester), and those who molest children only within the family (incest offenders).

      In order to make a diagnosis of Pedophilia, it is first necessary to prove or show the Defendant suffered from recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving prepubescent females. The examiner found no information from the evaluation, including the review of the records, indicating that the Defendant's possession of and self-reported viewing of child pornography was motivated by a sexual interest or urges as defined in the DSM-IV TR diagnosis of Pedophilia. He denied masturbating to climax or becoming sexually aroused by the images of child pornography or erotica involving prepubescent females. While he admitted that he has sexually fantasized and, sometimes, masturbated to thoughts of underage adolescent females, this would not qualify as pedophilic behavior.

      Despite having child pornographic images on his computer, the analysis suggests the vast majority were pubescent females. Clearly, someone who suffered from Pedophilia would have had predominantly, if not exclusive, catalog of prepubescent females. The forensic analysis revealed no signs of Mr. First trying to communicate on-line with young children, sending child pornography to other adults or underage children, or classifying the child pornography by certain types, which is often seen with pedophilic individuals. Aside from these behavioral indicators reflecting the absence of Pedophilia, other findings from the examination support the examiner's opinion.

      The results from the AASI indicated the Defendant exhibits a peer age heterosexual

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 13*

orientation, which is consistent with the available history of his relationships since adolescence, a reported by Mr. First. His mother told the U.S. Probation Officer that her son had had relationships with adult females. Moreover, the results from the AASI indicated the Defendant exhibited no clinically significant sexual interest in prepubescent females. Moreover, the available history indicated that the Defendant has not exhibited any unusual interests in children such as, preferring to associate with children at the exclusion of adults. The examiner's clinical opinion that Mr. First does not suffer from Pedophilia is also consistent with findings from Seto et al. (2006) indicating that 40% of fifty-seven men charged with possession of child pornography and who had no known history of sexually victimizing children were not diagnosed with Pedophilia.

The examiner also notes that in his forensic practice it is common to see individuals like Mr. First who download child pornography due to psychological reasons other than Pedophilia. While child pornography laws were intended to capture those who have a sexual interest in children, such laws never appeared to contemplate non-pedophilic motivations that cause individuals to download child pornography. For instance, a study on Internet pornography, including offenders who were caught with child pornography and/or communicating with children or police posing as children (Galbreath et al., 2002) found less than one-fourth of the offenders had a diagnosis of Pedophilia. More than half of the total population of offenders (either pedophilic or nonpedophilic offenders) only downloaded child pornography and two-thirds made no attempt to contact or meet a child for sex. There was 28% of the group that sent child pornography to actual children or police decoys. The examiner discusses these issues in the next referral question.

## 2. If not, what contributed to his apparent aberrant behavior?

The Defendant's actions in the current matter represented an extension of his mental illness and the way in which viewing pornography, involving either adult or underage females, served as a substitute for him attempting to develop and sustain age appropriate sexual relationships. The examiner explains this opinion below.

Mr. First suffers from a Schizoaffective Disorder that is characterized by symptoms of depression and schizophrenia. As seen by the history and his behavior during the interviews with the examiner, Mr. First suffers from disorganized thinking (as seen in his tangential digressions and loosening of associations during the interview), suspicious if not paranoid thinking (regarding how others have tried to or actually caused him harm in some fashion), and prominent depressive symptoms. The history reveals more severe psychotic symptoms such as catatonia (autistic-like behavior) and hallucinations. His disorganized thinking and depressive condition clearly influences how he behaves, as seen in his many interpersonal conflicts with family, girlfriends, and superiors at work.

His mental illness plays a central role in Mr. First's actions in the current matter. Feeling emotionally distressed over his history of failed romantic involvement with females, Mr. First turned to adult pornography to satisfy interpersonal and sexual needs. Mr. First was the master of his mind, where pornography became the vehicle to reconstruct the reality of his failed relationships by re-creating a reality in his fantasies where he had positive relationships

with adult females and in which he could engage in sexual relations with him. Over time, his thought drifted into the failed relationships with females during his adolescence. Subsequently, the Respondent began perseverating on his lost loves and disappointments from adolescence.

Having seen images of pornography involving adolescent females while foraging for adult pornography in the Internet, Mr. First accessed, downloaded, and viewed pornographic material involving adolescent age females. Similar to his use of adult pornography, he became focused on using the material involving adolescent females as stimuli to relive his adolescence whereby he redirected reality in his mind to that of having positive relationships with adolescent females with whom he was also sexually active. Part of this fantasy involved him sometimes masturbating to the fantasies of sexual involvement with the females to achieve sexual gratification. His preoccupation with his distorted, disorganized thinking prevented him from exercising necessary judgment and reasoning to realize his actions were wrong. Rather, he maladaptively and unconsciously attempted to work through his emotional distress over his interpersonal problems with females from his adolescence.

The few images of prepubescent pornography he had on his computer appeared to result from incidental downloading or possibly he had a passing interest in it when he came across it on the Internet. Mr. First has maintained that he did not become sexually aroused by this material nor did he masturbate to it. This is consistent with the findings from the evaluation indicating that he does not exhibit sexual interest in prepubescent children.

### 3. What is his risk to engage in future sexually offending behavior?

The Defendant shows a low potential to engage in sexually abusive behavior toward children. This is the best assessment that can be given because the examiner knows of no way to determine someone as having no risk. Current risk assessment strategies are not precise enough to render a categorical risk level better than low. The examiner explains how he arrived at his decision below.

Current theories of risk assessment indicate that actuarial risk assessment methods are more reliable and valid than structured or unstructured clinical assessment. Unstructured clinical assessment has the lowest correlation with risk prediction than any of the three methods, while actuarial and empirically derived instruments have better predictive validity (Hanson & Morton-Bourgon, 2007). Having said this, the examiner notes that all actuarial risk and empirically guided clinical assessment instruments were developed and cross validated on sexual offenders who committed hands-on offenses. No studies have examined the use of these instruments with men who have been charged with possession of child pornography. In fact, when faced with someone like Mr. First, we are not trying to predict sexual reoffense because all indicators point to the fact that he has never sexually abused a child. Consequently, the risk assessment goal is to determine if he will sexually abuse a child because of his viewing of child pornography. No risk assessment instruments are available to make this determination. Therefore, the examiner had to rely on unstructured clinical assessment methods.

The literature on individuals who view child pornography is sparse when trying to determine the potential of sexually abusing children. The examiner is aware of only one

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 15*

published study on the subject (Seto and Eke, 2005). The sample consisted of 201 child pornography offenders. This study was comprised of essentially three types of offenders: those who viewed child pornography only with no known sexual acts toward children (CP only), those who viewed child pornography and had molested children (CP/CM), and those whose general impulsive or antisocial personality led to them viewing child pornography with no known sexual acts toward children (AP only). Only 1.3% of the CP only group (of which the Defendant most closely matches) and 2% of the AP only groups sexually abused children after their arrests for child pornography. The CP/CM group sexually reoffended at a rate of 9.3%, which was considered statistically significant from the other two groups. The examiner notes this study has short follow up period (average time at risk of 2.5 years; range between 15 days and 6 years). These findings suggest that individuals who have a prior sexual interest in children as expressed by sexual abuse of children combined with viewing child pornography show a greater risk for later sexual offending against child than those individuals who have only viewed child pornography with no apparent pre-existing sexual interest in prepubescent children. Moreover, the study results suggest that the viewing of child pornography is consistent with an already existing sexual interest in prepubescent children for those offenders in the CP/CM group. The circumstances associated with an increased risk to sexually abuse a prepubescent child appear absent with the Defendant. It should be further noted that the CP only group (to which the Defendant matches) had the lowest rate of engaging in further child pornography offenses (3.9%) followed by the CP/CM group (5.3%), and the AP only group (8.2%), which were considered statistically nonsignificant.

The findings from the evaluation combined with the extant literature on child pornography and the diagnosis of Pedophilia and later sexual offending against children appears to indicate not only is viewing of child pornography possibly motivated for reasons others than a sexual interests in prepubescent children but it is not evitable that such individuals will engage in sexual offending against children. Moreover, these findings support the general clinical and sexual recidivism literature that deviant sexual interests in children is a robust predictor of sexual reoffense (Hanson & Bussiere, 1998 and Hanson & Morton-Bourgon, 2004). As stated previously in the report, the Defendant shows no sexual interest in children. His possession and viewing of child pornography represents his maladaptive attempt to cope with his psychological distress.

Under these circumstances from this evaluation, the examiner finds that Mr. First would be appropriate for a minimum sentence as proscribed by law.[1] While Mr. First violated the law for possessing child pornography and re-victimizing the children contained in these images, it should be recognized that his behavior was not drive by pedophilic interests but was symptomatic of his mental disorder.

If the Court decides to place him under supervised release upon conclusion of his sentence, the examiner recommends that Mr. First be required to participate in mental health treatment. The focus of his treatment needs to be on his mental disorder rather than on sexual-offense-specific treatment. His sexual offense should be handled within the larger context of

---

[1] Mr. First would actually make a good candidate for a grant of probation, from the standpoint of his low risk to the community, but the examiner realizes that a prison sentence is mandatory in this case.

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 16*

his mental disorder.  Ideally, Mr. First should take psychotropic medications that will address both his psychotic and mood symptoms.  He has not taken psychotropic medications since his adolescence and the affect of this has been seen in his poor adjustment over the years. While the examiner hesitates to recommend Court-ordered psychotropic medications, it may be indicated in this case, if after release, Mr. First shows decompensation in his behavior.

Based on the reasons motivating his behavior in the current matter and his low level of risk to sexually abuse a child, this examiner does not see a need for the Court to impose lifetime community supervision.

The examiner recommends that Mr. First be placed in a Federal institution where his psychiatric condition can be monitored and treated. If he participates in treatment while incarcerated including, taking psychotropic medications, he will have an easier time adjusting in the community upon release and hopefully continue to take his medication.

Brian R. Abbott, Ph.D.
Licensed Clinical Psychologist
PSY 18655

*FIRST Psychological Evaluation*
*June 10, 2008*
*Page 17*

## REFERENCES

Galbreath, N.W., Berlin, F.S., & Sawyer, D. (2002). Paraphilias and the internet. In A. Cooper (Ed.) Sex and the Internet: A Guidebook for Clinicians (pp. 187-208), New York: Brunner Mazel.

Hanson, R.K. & Bussiere, M.T. (1998). Predicting relapse: A meta-analysis of sexual offender recidivism studies. Journal of Consulting and Clinical Psychology. 66(2), 348-362.

Hanson, R.K. & Morton-Bourgon, K. (2007). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis. Canada: Dept of Solicitor General.

Hanson, R.K. & Morton-Bourgon, K. (2004). Predictors of sexual recidivism: An updated meta-analysis. Canada: Dept of Solicitor General.

Seto, M.C., Cantor, J.M., & Blanchard, R. (2006). Child pornography offenses as a valid diagnostic indicator of pedophilia. Journal of Abnormal Psychology, 115(3), 610-615.

Seto, M.C. & Eke, A.W. (2005). The criminal histories and later offending of child pornography offenders. Sexual Abuse: A Journal of Research and Treatment, 17(2), 201-210.